Good morning Judge Benavides, Judge Southwick, and Judge Costa, my name is Alfonso Kennard and I'm counsel for appellant and a heck of a good guy Maurice Goudeau. Well, there sure are a lot of old farts around here and we need to find a way to get rid of them, are those stray remarks or is that evidence of an ageist mentality? We believe that all things taken together it's clear that at the very least a fact question exists in this matter as to whether or not Mr. Pierre Goudeau was terminated because of his age but for under the federal standard or a motivating factor under the Texas Labor Code as to the discrimination component. Well, regardless of what that phrase at the time that it was said indicated about the speaker, of course our requirements as imposed, as recognized by the district court as well, go into timing, go into what else you have as evidence and so this case as you appreciate is a whole lot more than just what that meant when Perkins used those words. Absolutely and I agree Judge, that's just one component of what we're looking at, those comments, but I think it's important to see what ultimately happened here. Remind me, how long prior to termination of your client were those words spoken? Well, Michael Perkins was the manager that came in and inherited this group of workers when NOV took over from Reid Heikkilaag. Mr. Goudeau was one of the supervisors there and at the time that Mr. Perkins came in, he began in August of 2010 and beyond that making these comments. Getting back to the question, do we know when it was? From my reading of the briefs, it's sometime between August of 2010 and January of 2011. Is that what we know about when these comments were made? That is correct Judge. We don't have anything more specific. So it could be as late as December or early January of 2011 or it can be as far away as August of 2010. Right. Within that time span, his testimony shows that within that time period, these comments were made on a repeated basis. It wasn't just an isolated set of comments made on one occasion. It was during this relevant period of time which ultimately led . . . Are the comments having to do with the old farts or are the comments having to do with I'm going to fire him. We're going to start a fire here. Was that also repeated or what was repeated? It was a combination thereof. Initially, the main thrust was about having an older workforce and a series of comments as the ones you just described that Mr. Goudeau testified to. But, he had also concocted a plan that was made known to Mr. Goudeau to terminate or figure out a way to youngen up the workforce and get rid of some of the older employees. When Mr. Goudeau did not agree or succumb to that notion and made it very clear that this is wrong and I'm going to go to HR, which he did go to HR, he was immediately retaliated against when he . . . starting in January of 2011. Our contention is . . . Wait, wait, wait. He was immediately . . . What is that retaliation? Well, our contention is it was a series of events that culminate into retaliation. It wasn't just the termination. So, he wasn't immediately retaliated. I mean, they didn't have . . . they didn't take any kind of adverse action at him immediately. Well, he was stripped of his duties. Remember, he was a supervisor and he got . . . that was taken away. His supervisory capacity was diminished. In fact, he went from supervising numerous employees to not supervising any. Subsequent to that . . . Judge, that is one component of an adverse employment action. And it goes to the hostility in the workplace and it goes to a sequential state of events that ultimately led to a termination in August. But it was that . . . Hadn't we said, though, that taking duties, supervision away, that doesn't affect his salary, doesn't affect other aspects of employment, is not by itself an adverse employment action? Well, when you are a supervisor and you are supervising individuals and later you are not, that goes to the heart of what you're doing. This is a guy that's been there . . . I'm just wondering if it's case law to the contrary of what you just said, but apparently you're not ready to speak to that. We haven't briefed that . . . Did they take away some of his supervisor's duties or did they take away his title and his title also? The title remained the same.  He still had the same title. He still had the same compensation. He just had less duties. Correct. And then subsequently in March, he was then written up. He was given a performance review that was not consistent with his previous work history. This is a guy that had been there 17 years, didn't have any negative history, didn't have a history of write-ups. In fact, was given good reviews. The manager that was in place before Michael Perkins gave him great reviews. It wasn't until March, post his going to HR to report these instances and these statements made by Mr. Perkins, was it that he received . . . Now the first complaint about him, though, that comes in has to do, I thought, with him not completing a task. He was asked to do something and he didn't do it. That's the contention, Your Honor. Defendants contend that that was something that he did. However, we look at the ultimate documentation that was used to support the termination. Three of those four reviews were not even presented to him until after termination. Let me make a point. With reference to that first thing that supposedly used to show non-bias or non-illegal motivation or reason, that statement . . . The first one was for something that he was told to do and he didn't do it. Now, your reply was, well, then later on they had some stuff that he was not given. But, that first one, he signed it. It was given to him. Did he say, no, I performed it? Well, he prefaced that and it's in the record. It shows the actual document, the write-up . . . Well, did he say that he did that? That, no, that's not right. I did actually do that work. He did. He actually wrote that before he signed it on January 11th. We contend that was the first step of retaliation, or the next step, I'm sorry, beyond him being stripped of his duties . . . after Mr. Goodell went to HR and complained of age discrimination. That's when the first write-up came, in January. Now, ultimately, we think the court erred by not interpreting the facts in favor of the plaintiff here. We also believe that the court found incorrectly that there was an absence of fact issued here. Someone's right, someone's wrong here. We've got two . . . we've got a bad actor. We contend it's Perkins, and we have Maurice Goodell, who's provided statements and has also been deposed. I think it's important to note here that defendants claim that we shouldn't lend any credibility to Mr. Goodell's testimony . . . and his affidavit that was submitted along with the response for summary judgment, because it's a sham. Well, the court actually did find that it was not, in fact, a sham. In fact, the trial court ruled that that affidavit was consistent with the testimony given at deposition. And, that was the basis for the court's finding that there was, in fact, a prima facie case of discrimination and retaliation. Now, to say that, well, this is . . . the court . . . to say this is not a sham when it comes to the analysis as to prima facie . . . but suddenly is a sham when it comes to evaluating pretext, we think is beyond disingenuous. If it's not a sham for one context, it should not be a sham for another. A prima facie case . . . You're saying that if it's sufficient to make a prima facie case, it necessarily is going to be sufficient to raise pretext? Well, it should be sufficient to be considered. And, if we're taking, as we should, for . . . under a ceremony judgment, the facts in favor of the plaintiff, where there's a question, we should lend credence to him. A big thrust of the defendant's argument is that you shouldn't even consider what he said, because it was a sham, as it pertains specifically to the notion of pretext. Well, if we take the inference in favor of the plaintiff, we should give credence to what was stated in his testimony. I think, additionally, the defendants state that there was no causal connection. The court found that there was no causal connection. We have statements that were made. They don't dispute that these statements were made by Mr. Perkins. They just dismiss them as stray remarks. Well, going back to . . . The statements, if anything, go to the age discrimination. Wasn't the causation issue on the retaliation? I mean, are there any remarks that indicate a retaliatory motive, as opposed to a discriminatory one? Well, that would have come after he had made the complaints to Human Resources. So, he made the complaints of these remarks. They were reported to Human Resources. Mr. Perkins got tired of him going to Human Resources. In fact, told him as much, you need to quit going to HR. This needs to be handled by us. You need to quit going to HR and making these claims. Mr. Kennard, my point . . . Stay near the microphone. This is being recorded for the ages. If you make your points moving along, do it more figuratively than physically. I'm trying to get steps for my Fitbit. Understood. I just got it. I'm real excited about it. But, the causal connection, ultimately, is the statements were made. There was a complaint made by Mr. Goudeau, and it's important to see what actually happened here. In fact, Perkins, in August of 2011, fired both Fisher and Goudeau. The very guy that Goudeau was warning HR about said, Perkins is out to get Fisher. In fact, he tried to enlist me to help get rid of Fisher, and I refused. Well, sure enough, on August 11, 2011, both of them, both the old farts and the complainer, got fired. In fact, there was an email that went from Perkins to HR saying, oh, by the way, there's going to be two terminations today. Not just Fisher, but also Goudeau. So, when we're talking about causal connection, we can't just, in stray remarks, clearly just these remarks in and of themselves are not going to You're saying it's not very stray. He's saying I'm going to get rid of those guys, and he does. And it happened. Exactly. And they're old, too. Correct. Fisher was, in fact, the guy that he was complaining to HR about, saying that Perkins was trying to get rid of Fisher, too. He got rid of both of them in one swoop. So, that's the point there. I know the stray, otherwise, these remarks in and of them, just taken by themselves, may not be as meaningful to this court. But taken with the evidence of what actually happened, because before we even filed this lawsuit, we knew what happened. We knew exactly what happened, and that was that both of them were actually terminated. And this is what Pierre Goudeau was warning everyone about from the very beginning, at the very least here. On that issue alone, we have a fact question. What's your evidence? Excuse me. The district court came out the way it did primarily by applying our legal structure to all that you've been talking about, which you haven't really gotten into yet, and the somewhat, perhaps, confused state of whether we apply a four-factor test or a two-factor test to this sort of thing. But the evidence that suggests ageism, discrimination against people of a certain age, is all dated. And if you apply the four-factor test, that gap between the age statements by Perkins and the actual adverse action against your client is a problem under the test. Speak to that. Well, if we're looking at the temporal proximity issue, again, our contention is that the ultimate retaliation did not begin on August 11th when he was terminated. It started when he went to HR for the first time, and it was a series of events taken together that ultimately led to the termination. But it started with the pulling away of duties. What you need is that the motivation for the various actions that he's talking about remain age-based. And our test, which looks at the temporal proximity of the statements that give that indication, is to show the continuation. And you're saying it's implied that those continue to be his motivations. It finally took him that long to get rid of your client. But that's not the way—I don't think that's the way that our case law operates. So it seems—can you—are you here arguing that even on the four-factor test that we should reverse, or do you need us to switch to, from our recent iteration, set it out and read in some other cases like Russell, that we don't look at the four-factor test? Well, I think—and that's the point. I think, ultimately, we need to focus in on when the retaliation began. Now, it ended in August. Even if we look at—even the defendants say— Detroit applied the two-factor test, though, because he said it was a circumstantial case, and his reading was under—to get a prima facie case under the circumstantial test, you need the less stringent two-factor test, right? Correct. Because then you've still got the burden of showing pretext. I mean, that doesn't end the story like it does in a direct evidence case. That's right, Judge. And so on pretext, which is where you had a problem in the district court, what's your best evidence of pretext? I mean, you've got the remarks, which can still be considered, but you've got to show something more to rebut the employer's claims of misconduct and not doing assignments and everything else they've got. I think the timing of when the write-ups were submitted are key here as well. He was not afforded these write-ups until the very end, until after he was terminated. Had this truly been an issue, that's something that would have been presented to him over time, which it was not. There aren't any e-mails or anything contemporaneous to those periods in time that these instances actually occurred or allegedly occurred that were made known to him and that were deemed to be serious. Again, at the end of the day, we think a reasonable person, in light of all facts, could see, taken all together, that the statements that he made have credence, have credibility, and should be considered ultimately by a jury. We think that we get beyond pretext here, and even if we don't get through it on the federal standard, I think at the very end of the day we get through it under the Texas Labor Code. I see my time is up. Thank you. All right. May it please the Court, Chris Moore here on behalf of National O.L. Barco, L.P. So a couple of things I wanted to address. Some of the questions Your Honor asked Mr. Kennard, I think one of the most pertinent ones was, not that they weren't all pertinent, but was what is your best evidence of pretext? Well, that is fundamentally where this case fails. He can't point to pretext. Let me ask you a question. There were three reports for July 15, 2011, and they all have the same date, and one of them says warning, the other one says additional warning, the other one says final warning, and they all come on the same day. Now how did he get this warning, an additional warning, and a final warning all on the same date? You know, usually if I warn somebody, say, hey, this is a serious warning, and then I come back and say, hey, this is a final warning, but they all happen on the same day. How did all these gradations of warning happen on the same day? Well, there were three different events, and, yes, they were all dated by Mr. Perkins on July 15, 2011. However, the text of the actual warnings is related to other events that happened at other times, and this was explained. It's in the record. Mr. Perkins managed several different facilities, okay, so his method of dealing with things like that was to take these things and accumulate them and deal with them when he was back at the facility, which is exactly what happened here. It's exactly what he explained. He was either on vacation or at another facility, and when he got back, he dealt with the warnings. And, okay, so in those warnings, he gives the specific date, different dates, and he says that I warned him, and then I gave him a final warning, and then I gave him a final warning, and it's just that he just didn't record them or make them until July the 15th. He did speak with him about at least, we know, one of those incidents from this record. The three warnings were June 26, an incident where there was a power outage, and Mr. Goudeau failed to supply the software to the facility to get the machines back up. It affected seven different shifts because of that power outage. He's a maintenance supervisor. That was his job. He didn't do it. On July 12, there was a write-up against quality and safety for failing to inspect fire extinguishers. Which ones of these did Goudeau receive an oral warning about before the written ones that were all signed on the same day? Because I thought the record, and first of all, we have to view it in favor of the plaintiff, but even on that, I think your brief says some of the warnings were given to him before the date he was fired. But that implies, obviously, some of these warnings are shown to him for the first time on the day he's fired, and that, I mean, as Judge Benavidez was saying, the whole idea of a warning is to let someone improve. Right, and so the first one he received was January of 2011, when he just flat-out refused and failed to do exactly what he was asked to do. Right, but what about the four he gets on the day he's terminated? The four later were the one that we know of from this record that he was actually communicated about was the lockout-tagout project, which he was assigned to do with Mr. Holland. He was specifically asked, and this is his testimony, how's the lockout-tagout project going? I don't have nothing for you, Mike. This was three weeks after he was assigned the project. And so the other three he doesn't find out about until the day he's fired? I don't know if he knew or he didn't know. The record doesn't reflect that. I thought he said he didn't know. I thought Goudeau said he didn't receive them until the day he was fired. He doesn't argue that these events occurred. He says it's not my responsibility. No, I thought he said he didn't get the warnings until the day he was fired. These written warnings dated 7-15-11. That is his allegation, but I would say— Well, it's his test. I mean, it's evidence that we have to construe in his favor, no? True, but that doesn't get you past pretext. And the reason is he agrees that these events occurred. It's not my fault. The fire extinguisher issue, that wasn't my fault. Not my responsibility. Not my job. Why doesn't it cast some doubt—I mean, that's what pretext is— that these were the real reasons for him being fired when he wasn't even actually warned? I mean, a warning is saying you did this, fix it. That's evidence of mendacity. In other words, if he didn't get— if this guy says I warned him, but he didn't get warned, and the evidence shows that all these warnings, first, second, third, final, absolute, whatever, all occurred, are dated at the same time, doesn't that flavor this idea, especially when he says I'm going to get rid of these old farts and he fires them? I mean, the thing about temporal proximity is we've— it comes back to the rule where he says that alone will not do it. You know, that alone will not do it. His best argument, and I don't know if it's good enough, but his argument here really is that's not alone what happened here. It's not just the temporal proximity. You know, they present some things that weren't even given to me. They say that they're warnings. I never was warned about them. I didn't get told of them until the day I got fired. Plus, they fired the people. The guy that's in charge of making these decisions said he was going to fire these people because they were old. They got fired, and so did I. And he said I wore old people's clothes. There's a lot in that statement, and I'll try to respond to what— Well, I'm looking at it from the best light and most favorable to the plaintiff, which is what we're supposed to do. Which is exactly what Judge Hoyt did when he was looking at this. He took that affidavit, which was against virtually everything that Mr. Godot said in his deposition. He couldn't recall what he said to HR, when he went there, what his complaints were when I deposed him, yet when he comes out with an affidavit, he's got all these details about when things happened. With respect to these warnings, he goes through, and I brought this declaration up thinking this might be an issue. He just says I wasn't responsible for the fire extinguisher. I wasn't given an opportunity to review these things. Well, I'd submit to you, and you make a point there, but Title VII and the ADA and these anti-discrimination statutes, they don't require you to sit down and give an employee an opportunity to rebut, and Judge Hoyt's decision hinges on that. Judge Hoyt found that there isn't any evidence of pretext here, that there's no proof that Mr. Perkins made these issues up. Well, counsel, one of the parts in our case law is that the reason somebody's fired doesn't have to be what he actually did. It just has to be supportable that that's what the employer thought he had done. But what we're talking about here is a little different. The write-up says he's responsible for the fire extinguishers. He's saying he's not. If, in fact, he's not and an employer knew he wasn't, it seems to me that's additional evidence that these are pretexts. And you're right, but there isn't that evidence there. His statement. And his statement isn't sufficient. His disagreement in the case law, C.B. Richard Ellis' Sanstad case, says exactly this, that an employee's judgment about his own performance isn't sufficient to create an issue of fact. We're not talking about that. We're talking about job duties, and I don't know how your client reflects job duties, but there may be a clear answer to whether these were his job duties. There may not be. So it seems to me the case law you're talking about is you came up with it quickly and it's relevant, but I don't know if it's quite on point. But why don't you move on? Sure. And just to circle back on these issues, he was warned, okay? You weren't warned, counsel? He was warned about his performance. Mr. Kennard did mention that he supposedly got great reviews in the past. The record doesn't show that. The record shows that he got a 2 rating in a follow-up issue and documentation issue by his prior supervisor. He was then counseled in January for failing to do exactly that, for failing to follow through on his job. He wrote on the form, I failed to follow through. He wrote that himself. Then he got a performance review in March that says you need to do these five things. Well, what happened? He got mad about that. So he went to the supervisor. He discussed it with him, and Mr. Perkins agreed, okay, these four things stand. I'm taking this one off. So they had a dialogue about this. He did have a warning. He did have discussions. He wrote a response. And there's no question with those. He didn't take the position that he wasn't given those. Correct. And he didn't take the position. He doesn't take the position that the events reflected in these didn't happen either. And that's the point is that in order to show pretext, and Judge Hoyt got this, I think he pulled it right out of the Wagner v. City of Garland case, the employer shows a good faith belief that they are acting appropriately in response to performance issues, complaints of harassment, things like that. Then they've got to show to get to the pretext, to pass the pretext test, that those reasons are unworthy of credence or false. And this record does not reflect that. The problem that you have here in most cases, the actual decision maker is not necessarily the one that is making the performance evaluations. You know, you usually have a company, and they have good reason to believe this is what their employees are saying about this guy. And the decision maker looks at it, and he says, well, we're going to have to get rid of this. Here, the problem that we have here is that the same person that makes the decision is the same person that makes the comments, which are pretty negative. He doesn't say, you know, he says, I'm going to fire him. I'm going to fire these old people. It's pretty strong stuff. And he is the same one that files the reports, and he is the same one that says that he's a bad performer. And he's the same one that's alleged to be the retaliator, and he makes the employment decision. We hardly ever get a situation where everything kind of merges like this. Well, and I've got several points that I would like to make in response to that. First, I was really careful with Mr. Godot at his deposition to get him to articulate exactly what it was that Mike Perkins said. And so he told me at that, and he testified that he said, we sure have a lot of old farts around here. Didn't they? We sure have a lot of old farts around here. Okay, so that's something that the court has to accept. Then there's a discussion about employees. There's a discussion about Bill Fisher and Joe Jett. And then Mr. Godot alleges that he says, I'm going to fire – first thing I'm going to do is fire Bill and Joe. Okay? But he didn't say because they're old, and that's the key point in this case. He never made – that statement was not correct. That's not reflected in the record, and I was very careful to parse that through with Mr. Godot, and the record shows that. So there is no connection between those things other than the fact that they occurred in a conversation that lasted several minutes while these guys were smoking cigarettes. Okay? The counsel told us – he may have made a misstatement – but he said that these statements were repeated on various times between August of 2010 and January of 2011. So is it one time because you carefully got him on his deposition, or is he telling the truth that these comments were made more than one time? I think the – Mr. Godot said that the comments occurred sometime within a year prior to his January write-up. Okay? Because Mr. Perkins didn't get there until August, it was probably between August and January. During that timeframe, all we have is old fart, old man clothes, and is this where the old people meet, all related to – And were they repeated, or was it a one-time thing? That was it. Now, when he later came back and said in his affidavit, he then said, oh, this happened all the time. And so, yes, that's contradictory. But you know what? Judge Hoyt accepted that, and he applied that evidence in the proper place, which was can he establish the prima facie case. But without anything else other than the fourth element being proven by that, he can't get to pretext just by saying that Mr. Perkins said three comments sometime within a year or even more before his termination are actual – that those things were pretext for his termination. He just can't connect the dots, and that was the point that Judge Hoyt made in his opinion. And I'll use a case to illustrate that. The Wagner v. City of Garland case that I mentioned a little while ago is a fairly old case, but it's surprising how similar it is to this case. We have a person who was alleged to have committed sexual harassment. We have an employer who then investigated and decided, based on that investigation, to fire this employee. He then challenged it, but the court rejected his challenge. There was an old FARC comment, and it was made by the people who were involved in making the decision. They rejected that as a reason – as connecting between these two events. Furthermore, on these write-ups that Mr. Godot says that he didn't ever receive or have any notice of or weren't his responsibility, he says that they were based on hearsay that Mr. Perkins obtained from other people, that he didn't – Mr. Perkins didn't personally observe these things. Well, to me, that suggests, again, we don't have Perkins making things up to – in order to fire him. Their own evidence, their own argument suggests that he didn't do that, that he was taking this information in and counseling this employee and not making things up, and that's what he's got to show to pass this pretext test in this case, and he didn't do it, and that was Judge Hoyt's point. It was the point of the court in Wagner when it was affirmed by this court. Another point on the retaliation issue, I think the court should strongly consider that Mr. Godot waived his right to challenge pretext in the retaliation context. He didn't brief that. He didn't brief it to this court, and so there's no – the only arguments he makes to this court are that the age discrimination termination decision was pretextual, but the evidence shows that. So the court doesn't have to reach the issue of causal connection on that, but if they do reach the issue of whether he properly showed a causal connection, again – and I think this court recognizes this. But they both fall on whether – you're not making any complaint about Judge Hoyt's finding on Prima Facie case. So this whole case then turns on pretext, and wouldn't the same pretext argument be made, the very same arguments advanced with respect to pretext for firing as pretext for the retaliation? I think they could, but I think you're looking at two different issues there. You're looking at – can you prove that it was a pretext for age discrimination? Okay. Well, what's the evidence? Well, it's these comments that happened a long time before the termination. What's the evidence of retaliation? Well, again, it's the comments that happened a long time – That's right. So you're looking at the same evidence. But they didn't – Looking at the same arguments. They didn't argue that, and that was the point I was trying to make was that, to me, that suggests a waiver by failing to brief that issue. Even if you don't consider that to be a waiver, on the causal connection issue, again, we're looking at – on the retaliation claim, we're looking at what? These comments. And there is no – these things were done so long ago. This court has held time and time again that passage of the amount of time in this case, which is within a year to seven months before, isn't going to carry the causal connection element on the retaliation issue. On retaliation, though, Judge White found no prima facie case. He did. That's correct. Because the timing was off between the protected activity and the termination. He did, and he also had a finding on the pretext issue. So I think that has to get affirmed on the basis of waiver for failing. Because the aegis comments, those don't really come into the mix on the retaliation, do they? I mean that's evidence of animus against old people. It's not evidence of retaliation. Precisely, which is why – that wasn't even argued, that there was evidence to suggest that. So that should dispose of the retaliation claim on its own. And as for the age claim, I mentioned before that the connection between Mr. Perkins in August to January of 2011 and Mr. Goudeau's termination in August of 2011 is just too tenuous. I'll also mention that this so-called plan that Mr. Goudeau says that Mr. Perkins had, which I've illustrated before wasn't articulated the way counsel represented. Well, he said Mr. Fisher and Mr. Jett. Well, he didn't fire Mr. Jett. Mr. Jett was found drinking on the job, went for a test, failed it. Perkins had nothing to do with that issue. Nothing. HR made that decision. So this whole idea that there was some long conspiracy by Mr. Perkins to terminate – Perkins didn't initiate the firing of that particular old fart, so to say. Did not. He initiated it himself by coming to work under the influence of alcohol. Mr. Perkins wasn't involved. HR discovered that and sent him for a test. Thank you. But Fisher, he did it – Mr. Fisher did get fired, yes, by Mr. Perkins, yes. But for the reasons I've articulated, Judge Hoyt got this exactly right. He presented all this evidence, but he never got to pretext, and that was one of the points. You asked what is that best evidence. Well, there isn't any. Judge Hoyt absolutely found that. He rejected all of my arguments, which I thought were good. Well, the issue about the warnings. I think the case comes down to whether the aegis comments combined with the suspicion plaintiffs are trying to raise about the four warnings, both their date and whether they were given to them, whether that's enough to get pretext. If I could respond, I will. Why isn't that enough? It's not enough because they don't show the falsity. His affidavit, if you look at it, he just says he wasn't responsible. This timing issue is false, and Judge Hoyt points it out as false. Whether and when he received them, not relevant, not a requirement under the law. Thank you, Your Honor. So for those reasons, the district court's judgment should be affirmed. Thank you, Your Honor. May it please the Court. I think I took something away from counsel's comments, and the main thing I took from that was when he stated, without anything else, we don't get to pretext on the discrimination issue. Well, that's something else. It's quite simply that connecting to the dots is quite simply that Perkins was true to his word. Jeff, Mr. Jeff, he took care of himself. He shouldn't have shown up to work drinking. He's going to get anybody fired. Perkins took care of the other two. He took care of Fisher, and he took care of Goodell. What is that something else? That's something else is we know what happened. Before I ever stepped foot in here today, before I ever filed this lawsuit, I knew what happened, that he actually got fired, and that Fisher got fired that same day. That's that something else. Counsel, would you straighten me out on something about the record? Kind of. Are you saying he didn't receive those notifications on July 15th or whatever the date is, or are you saying he was never warned or those events never occurred? In other words, is your client denying I didn't get the warnings? They weren't given to me until I got fired, i.e., I didn't get these written warnings. Or is he also saying I didn't get the real written warnings, and those things that are reflected in there didn't occur? Because I don't know what difference it would make if he didn't get written warnings, if he wasn't contesting or saying that those things that are reflected in there didn't in fact occur. At the end of the day, not everything is a terminable offense. Well, that's important because the scenario I was laying out for you, I kind of assumed that he was contesting all that stuff, but it sounds like all he was saying is I didn't receive them on those days. If my paralegal doesn't send a birthday card to my mom because I asked her to, I'm not going to write her up over it. If she fails to file a brief and I miss a deadline, I'm going to write her up over it. He didn't receive a single write-up for any of these instances. Okay, so the answer is he just says he didn't get them. He didn't get them, that's right. He didn't get them until the day he was terminated. Was he orally warned about those? Sorry? Was he orally warned? Apparently some discussions were had and some e-mails were exchanged, but nothing in the record shows those e-mails. There was nothing that indicated this was some severe event or this was some severe instance that requires termination. And clearly it wasn't such a big deal enough for him to be written up contemporaneously when these instances allegedly occurred. So I think that's key here. Basically, Pierre, come to my office, and here you go, here's three write-ups, you're fired. NOV didn't follow their own policies. They obviously have a step program. Oral warnings, write-ups, write-ups, final termination. That all happened in one day, which in and of itself is evidence of a discriminatory animus and should be construed in favor of the plaintiff. That's my issue here. I think the trial court ultimately erred by not taking these facts into account in the light most favorable to the plaintiff. They were simply dismissed. I think the defense puts a lot of eggs in the basket of, well, his statement wasn't sufficient. His statement wasn't sufficient and it was contradictory. And I think now there is no confusion. The court said in their footnote that upon reviewing Godot's deposition testimony and the affidavit, the court finds that the affidavit does not directly contradict any material statements in the deposition. Accordingly, the court concludes that the affidavit does not constitute a sham and will consider its ruling on the motion. We just think they didn't consider it properly when it came to pretext. Again, we're looking at pretext, we're looking at these causal connections, we're looking at the things that actually happened. And what happened here was that both the old farts got fired. That one old fart fired himself for drinking on the job. The guy was true to his word. He made these comments. There's no question that these comments were made. Nowhere in the record does anyone contest that these statements were not made. The only question is how often were they made, to whom were they made. But we have here animus of ageist discrimination, and the jury should get to decide. That's all we're asking for. Mr. Godot is just asking for his fair day in court. There's a lot of fact questions here. And that isn't for Judge White to ultimately decide. This is a question of fact, and I see that I'm now running out of time. Unless there's any other questions, I thank this court for its time. Thank you, Mr. Godot. Mr. Moore, we think we have your arguments. We're now here, the last case for the day.